Logan D. Smith (SBN 212041)
lsmith@mcnamarallp.com
Cornelia J. B. Gordon (SBN 320207)
cgordon@mcnamarallp.com
MCNAMARA SMITH LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  619-269-0400
Facsimile:   619-269-0401

Lionel Z. Glancy (SBN 134180)
Jonathan M. Rotter (SBN 234137)
Garth A. Spencer (SBN 335424)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  310-201-9150
Facsimile:   310-201-9160
Email: info@glancylaw.com

*Attorneys for Receiver, Thomas W. McNamara*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS W. MCNAMARA, as the Court-Appointed Receiver for Triangle Media Corporation, Apex Capital Group, LLC; and their successors, assigns, affiliates, and subsidiaries,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO & COMPANY, a corporation, WELLS FARGO BANK, N.A., a national banking association,<br><br>Defendants. | Case No. 3:21-cv-01245-LAB-LL<br><br>**RECEIVER'S OPPOSITION TO WELLS FARGO'S MOTION TO DISMISS COMPLAINT**<br><br>Judge:  Hon. Larry Alan Burns<br>Ctrm:  14A<br>Hrg. Date: N/A per July 30, 2021 Order [ECF No. 12] |

1

# TABLE OF CONTENTS

2

3    I. INTRODUCTION ................................................................................................. 1
     II. LEGAL STANDARD ......................................................................................... 2
4    III. ARGUMENT .................................................................................................... 3
         A.    The Receiver Alleges His Aiding and Abetting Claims ...................... 3
5              1.    Wells Fargo Mischaracterizes the Standard for Actual
                     Knowledge ................................................................................. 3
6              2.    The Receiver Alleges Aiding and Abetting Fraud ..................... 5
               3.    The Receiver Alleges Aiding and Abetting Breach of
7                    Fiduciary Duty ........................................................................ 13
               4.    The Receiver Alleges Aiding and Abetting Conversion .......... 15
8              5.    The Receiver Alleges Aiding and Abetting Fraudulent
                     Transfers ................................................................................. 16
9        B.    The Receiver Alleges Conspiracy to Commit Fraud ........................ 16
         C.    The Receiver Alleges Two Alternative Negligence Claims .............. 18
10             1.    The Receiver Alleges Negligence in the Alternative .............. 18
               2.    The Receiver Alleges Negligent Supervision in the
11                   Alternative .............................................................................. 20
         D.    The Receiver Alleges a Claim Under California Penal Code §
12             496 ............................................................................................................. 22
         E.    The Receiver Alleges an Unfair Competition Law (UCL) Claim ...... 23
13       F.    The Receiver Alleges an Accounting Claim ...................................... 25
         G.    The Receiver Withdraws His Direct Breach of Fiduciary Duty
14             and Unjust Enrichment Claims .......................................................... 25
     IV. CONCLUSION ................................................................................................ 25
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Aghaian v. Minassian,*
    59 Cal. App. 5th 447 (2020)................................................................16

*Ashcroft v. Iqbal,* 556 U.S. 662, 681 (2009).........................................3

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................2, 4, 6

*Bell v. Feibush,*
    212 Cal. App. 4th 1041 (2013).....................................................22, 23

*Benson v. JPMorgan Chase Bank, N.A.,*
    2010 WL 1526394 (N.D. Cal. Apr. 15, 2010) ...........................................4, 6

*Berger v. Varum,* 35 Cal. App. 5th 1013 (2019) .......................................16

*Bullis v. Sec. Pac. Nat'l Bank,*
    21 Cal. 3d 801 (1978)...........................................................19, 20, 22

*California Grocers Assn. v. Bank of Am.,*
    22 Cal. App. 4th 205 (1994)...........................................................24

*Camenisch v. Umpqua Bank,*
    Case No. 3:20-cv-05905-RS, ECF No. 33 (N.D. Cal. Jan. 28, 2021)..............5

*Chang v. Wells Fargo Bank, N.A.,*
    2020 WL 1694360 (N.D. Cal. Apr. 7, 2020) .......................................passim

*Chazen v. Centennial Bank,*
    61 Cal. App. 4th 532 (1998)...........................................................18, 19

*Cheever v. Huawei Device USA,*
    No. 18-CV-06715, 2019 WL 8883942 (N.D. Cal. Dec. 4, 2019)................12

*Choate v. County of Orange,*
    86 Cal. App. 4th 312 (2000)...........................................................17

*D.Z. v. Los Angeles Unified School Dist.,*
    35 Cal. App. 5th 210 (2019)...........................................................22

*Delfino v. Agilent Techs., Inc.,*
    145 Cal. App. 4th 790 (2006)...........................................................20

*Est. of Saunders v. C.I.R.,*
    745 F.3d 953 (9th Cir. 2014)...........................................................12

*Evans v. ZB, N.A.,*
    779 Fed. App'x 443 (9th Cir. 2019)...........................................................12

*Gonzales v. Lloyds TSB Bank, PLC*,
   532 F. Supp. 2d 1200 (C.D. Cal. 2006)..................................................................7

*In re First All. Mortg. Co.* ("*First Alliance*"),
   471 F.3d 977 (9th Cir. 2006)....................................................................4, 5

*In re Woodbridge Invs. Litig.*,
   2020 WL 4529739 (C.D. Cal. Aug. 5, 2020) ..........................................4, 5, 7

*Kidron v. Movie Acquisition Corp.*,
   40 Cal App. 4th 1571 (1995) ....................................................................17

*Kimball v. Flagstar Bank F.S.B.*,
   881 F.Supp.2d 1209 (S.D. Cal. 2012) .......................................................25

*Krause-Pettai v. Unilver United States, Inc.*,
   2021 WL 1597931 (S.D. Cal. April 23, 2021) ..........................................24

*Lacagnina v. Comprehend Sys., Inc.*,
   25 Cal. App. 5th 955 (2018) ....................................................................23

*Lee v. Hanley*,
   61 Cal. 4th 1225 (2015)...........................................................................15

*Lorenz v. E.W. Bancorp*, 2016 WL 199392 (C.D. Cal. Jan. 14, 2016) ....................7

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
   519 F.3d 1025 (9th Cir. 2008)...................................................................2

*Navarrete v. Meyer*,
   237 Cal. App. 4th 1276 (2015) .................................................................17

*Neilson v. Union Bank of Cal.*,
   290 F. Supp. 2d 1101 (C.D. Cal. 2003).........................................3, 7, 10

*Paskenta Band of Nomlaki Indians v. Crosby*,
   2016 WL 6094468 (E.D. Cal. Oct. 19, 2016) ..........................................8, 9

*Phillips v. TLC Plumbing, Inc.*,
   172 Cal. App. 4th 1133 (2009)...............................................10, 14, 18, 21

*River Colony Ests. Gen. P'ship v. Bayview Fin. Trading Grp., Inc.*,
   287 F. Supp. 2d 1213 (S.D. Cal. 2003) .....................................................12

*Rothman v. Equinox Holdings, Inc.*,
   2021 WL 1627490 (C.D. Cal. Apr. 27, 2021)...........................................24

*Sihler v. Fulfillment Lab, Inc.*,
   2021 WL 1293839 (S.D. Cal. Apr. 7, 2021) ............................................5

*Simi Mgmt. Corp. v. Bank of Am. Corp.* ("*Simi I*"), 2012 WL 1997232 (N.D. Cal.
   June 4, 2012),  ..................................................................................5, 11

*Simi Mgmt. Corp. v. Bank of Am., N.A.* ("*Simi II*"), 930 F. Supp. 2d 1082 (N.D.
   Cal. 2013) ...........................................................................................11, 15

*Siry Investments, L.P. v. Farkhondehpour,*
  45 Cal. App. 5th 1098 (2020) ..................................................................22

*Sonner v. Premier Nutrition Corp.,*
  971 F.3d 834 (2020) ................................................................................24

*Starr v. Baca,*
  652 F.3d 1202 (9th Cir. 2011) ..................................................................3

*Switzer v. Wood,*
  35 Cal. App. 5th 116 (2019) ....................................................................23

*Tan v. Quick Box, LLC,*
  2021 WL 1293862 (S.D. Cal. Apr. 7, 2021) ..............................................5

*Union Bank v. Superior Court,*
  31 Cal. App. 4th 573 (1995) ...............................................................3, 25

*Walker v. Countrywide Home Loans, Inc.,*
  98 Cal. App. 4th 1158 (2002) ..................................................................24

**Other Authorities**

Cal. Pen. Code § 484 ....................................................................................23

Rest. 2d Agency, § 213 .................................................................................21

Rest. 3d Agency, § 7.05 ..........................................................................21, 22

# I.  INTRODUCTION

For years, Wells Fargo knowingly assisted two massive, fraudulent "risk-free trial" schemes run by Triangle Media Corporation ("Triangle" or the "Triangle Enterprise") and Apex Capital Group ("Apex" or the "Apex Enterprise"). Critical to the survival and success of both was ongoing access to a steady supply of new bank accounts, which Wells Fargo opened for a series of shell companies fronted by straw owners. The Enterprises cycled through the shell companies to retain access to the merchant processing services necessary for the scams: when one shell company's processing was terminated, the Enterprises would create a new shell company, open new Wells Fargo bank accounts, and then apply for processing as a "new" business. Without a partner willing to continually open new bank accounts, the Enterprises could not have processed consumers' credit and debit card payments and the schemes would have cratered.

Wells Fargo was that partner. Employees at its infamous Community Bank branches opened more than *150 bank accounts* for 100 different shell companies across the two Enterprises, sometimes opening as many as 6 accounts in one day. Further, Wells Fargo bankers routinely utilized atypical banking procedures to advance the frauds; Wells Fargo counseled the principals on how to set up deceptive bank accounts with straw owners; Wells Fargo accepted funds obtained from the scams; and Wells Fargo authorized transfers of the fraud's proceeds from the shell accounts and into the principals' pockets, including into foreign accounts.

Because Wells Fargo kept opening new bank accounts for the Enterprises' shell companies, the frauds continued until the Federal Trade Commission ("FTC") stepped in to stop them in 2018. After the FTC sued, the Courts in both the Apex and Triangle actions appointed plaintiff Thomas W. McNamara as Receiver for the Enterprises. In that capacity, he investigated and discovered the harm resulting to the Receivership Entities from Wells Fargo's misconduct.

Wells Fargo's liability is the entirely foreseeable result of the Community

RECEIVER'S OPPOSITION TO WELLS FARGO'S MOTION TO DISMISS COMPLAINT

Bank's pernicious sales culture. Wells Fargo's willingness to become the bank of choice for fraudulent schemes has had devastating consequences, causing millions of dollars of harm to thousands of victim consumers as well as the Receivership Entities, on whose behalf the Receiver now sues. The Complaint contains dozens of specific allegations that show that Wells Fargo knowingly assisted both Enterprises' frauds where any other bank would have interceded or, at a minimum, ceased doing business with the Enterprises. But Wells Fargo's Community Bank employees were willing to assist these scams, because it was the Wells Fargo way: they were operating in the context of a high-pressure, volume-based sales culture that drove its bankers to open as many accounts as possible under the constant threat of termination—conduct to which Wells Fargo has admitted in a criminal Deferred Prosecution Agreement. The Apex and Triangle Enterprises needed Wells Fargo's banking services to carry out their frauds; Wells Fargo's bankers, who were operating under constant pressure to open new accounts, were happy to get the Enterprises' business. It was this symbiotic relationship that enabled the frauds to continue unabated until the FTC intervened.

The Court's analysis at this stage is straightforward, as it is only required to determine whether, on the face of the Complaint, the Receiver has alleged *plausible* facts supporting his claims. The Receiver has more than met his burden to do so, and the Court can quickly dispense with the Motion to Dismiss.

## II.  LEGAL STANDARD

To survive a motion to dismiss, a complaint is required to contain only "a short and plain statement" of the facts that gives the defendant "fair notice" of the claim "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007). The court is obligated to "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The threshold is not probability, but plausibility: "[t]he

factual allegations of the complaint need only 'plausibly suggest an entitlement to relief.'" *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)) (test is not whether allegations are true or probable, only plausible). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Iqbal*, 556 U.S. at 678.

### III.  ARGUMENT

**A.    The Receiver Alleges His Aiding and Abetting Claims**

Wells Fargo's briefing in opposition to the Receiver's aiding and abetting claims is peppered with misleading citations and conclusory arguments, none of which this Court should credit. For the reasons set forth below, the Receiver's allegations satisfy all elements of his four aiding and abetting claims. Put simply, Wells Fargo knew.

1.    Wells Fargo Mischaracterizes the Standard for Actual Knowledge

*a.    **Actual knowledge may be alleged generally under 9(b).***

Out of the gate, Wells Fargo misstates the pleading standard for alleging knowledge under Rule 9(b), suggesting that its heightened pleading requirements apply to each element of the Receiver's aiding and abetting claims. *See* Mot. at 5. But "while fraud must be pled with specificity, '[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally.'" *Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d 1101, 1119 (C.D. Cal. 2003) (quoting FRCP 9(b)). For the Receiver's claims which sound in fraud, the Complaint need only "allege generally that defendants had actual knowledge of a specific primary violation." *Id.* at 1120. The Receiver has done so. *See, e.g.*, Compl. ¶¶ 238, 255, 259, 287.

*b.    **California law supports a finding of actual knowledge.***

Wells Fargo next attempts to skew the California case law on the pleading of actual knowledge in its favor. The Receiver recognizes that the bar is high; California law requires "a strict application of the pleading requirement for the

knowledge element aiding of an aiding and abetting claim" brought against a bank, *Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1152 (2005), so as to protect financial institutions acting in good faith. But Wells Fargo was no such institution. Wells Fargo's misconduct as alleged here far exceeds that of other cases in which banks were found to have actual knowledge under *Casey*.

In California, courts first ask whether a plaintiff has directly alleged that a defendant had actual knowledge. *See, e.g.*, *Chang v. Wells Fargo Bank, N.A.*, 2020 WL 1694360, at *4 (N.D. Cal. Apr. 7, 2020); *In re Woodbridge Invs. Litig.* ("*Woodbridge*"), 2020 WL 4529739, at *6 (C.D. Cal. Aug. 5, 2020); *Benson v. JPMorgan Chase Bank, N.A.*, 2010 WL 1526394, at *3 (N.D. Cal. Apr. 15, 2010). "If a plaintiff directly alleges actual knowledge" (which the Receiver clearly has), the "question is [then] whether the complaint pleads sufficient facts to make that allegation ***plausible*** as required by *Twombly*." *Chang*, 2020 WL 1694360, at *4 (emphasis added). That plausibility can be established at the pleading stage by circumstantial allegations of knowledge, including that a defendant had knowledge of suspicious activities and "red flags." *See, e.g.*, *In re First All. Mortg. Co.* ("*First Alliance*"), 471 F.3d 977, 999 (9th Cir. 2006) ("That Lehman came upon red flags which were seemingly ignored was enough to establish actual knowledge under the California aiding and abetting standard."); *see also Woodbridge*, 2020 WL 4529739, at *6-7 (recognizing "the Ninth Circuit's clear statement that unheeded red flags 'are enough to establish actual knowledge'").

Wells Fargo largely omits reference to the growing body of law which holds that the presence of "red flags" and suspicious activity are sufficient for alleging actual knowledge. Its only comment on the relevant cases appears in a footnote, where it tries to discredit their holdings by stating that a "few courts have drifted from [California's] high standard [for alleging actual knowledge]." Mot at 6 n.4 (citing *Chang* and *Woodbridge*). In so doing, Wells Fargo ignores the slew of cases in line with *Chang*, *Woodbridge*, and California's uncontroversial and settled

standard for actual knowledge, including recent cases in the Southern District and Ninth Circuit. *See, e.g.*, *Sihler v. Fulfillment Lab, Inc.*, 2021 WL 1293839, at *5 (S.D. Cal. Apr. 7, 2021); *Tan v. Quick Box, LLC*, 2021 WL 1293862, at *11 (S.D. Cal. Apr. 7, 2021); *see also Simi Mgmt. Corp. v. Bank of Am. Corp.* ("*Simi I*"), 2012 WL 1997232 (N.D. Cal. June 4, 2012). *Simi I* is particularly instructive. In that case, Bank of America made actual knowledge arguments strikingly similar to those made by Wells Fargo here. The court rejected them out of hand, noting that the bank was "incorrect in its assertion that a heightened pleading standard attaches to *Casey*'s 'actual knowledge' requirement," as "[n]either the Federal Rules of Civil Procedure nor case law call[ed] for the vaulted pleading standard that BofA [had] propose[d]." *Id.* at *6. Likewise, when the defendant bank in *Camenisch v. Umpqua Bank* ("*Umpqua*"), Case No. 3:20-cv-05905-RS, ECF No. 33 (N.D. Cal. Jan. 28, 2021) "criticize[d] *Chang* and *Woodbridge* as supposedly loosening the pleading standards for cases such as these," the Court soundly rejected the bank's contention, stating that the courts in both "*fully ground[ed] their analyses in existing law*." *Id.* at 5 n.1 (emphasis added).[1]

### 2. The Receiver Alleges Aiding and Abetting Fraud

For Wells Fargo to be liable for aiding and abetting the Apex and Triangle frauds, it (1) "had to have known of [the Enterprises'] fraudulent acts" and have "had knowledge that its actions would assist [the Enterprises] in the commission of the fraud," and (2) had to have "provide[d] substantial assistance to" the Enterprises in fact. *First Alliance*, 471 F.3d at 992-93. The Receiver's allegations satisfy both criteria.

#### a. *The Receiver has plausibly alleged Wells Fargo's actual knowledge of the underlying fraud.*

Wells Fargo cannot deny that the Receiver has alleged its actual knowledge of the Enterprises' fraud. *See, e.g.*, Compl. ¶¶ 6-13, 68, 70, 74, 77, 135-40, 143-46,

---

[1] Wells Fargo's counsel is aware of the *Umpqua* order, given that they also represent the defendant bank in *Umpqua*.

177-78. As alleged in the Complaint, "***Wells Fargo bankers were aware of the Enterprises' risk-free trial schemes, understood the people listed as "owners" of the Wells Fargo accounts did not actually own or control them, and knew the Enterprises were engaged in credit card laundering.***" *Id.* ¶ 6 (emphasis added).

Each component of that allegation is supported by dozens of more specific allegations. Together, those allegations make it more than plausible that Wells Fargo had actual knowledge of the fraud. *See Twombly*, 550 U.S. at 556. The Receiver has alleged, among other things, that Wells Fargo knew that the Enterprises routinely opened depository accounts for new shell companies, while simultaneously closing the depository accounts of older shell companies that had lost access to merchant processing services due to high chargeback rates (*see* Compl. ¶¶ 78-81, 84-87, 178-86); Wells Fargo knew both Enterprises were involved in high-risk, online businesses known to be fraught with fraud (*id.* ¶ 87, 92, 97, 128-131, 170-77, 220-25); Wells Fargo knew the Enterprises' principals were concealing and falsifying beneficial ownership information for the shell accounts (*id.* ¶¶ 88-93, 112-23, 141-69); and Wells Fargo knew the Enterprises were incurring chargeback rates more than three *hundred* times higher than the average chargeback rate in the country (*id.* ¶¶ 98-102, 179). These allegations, among others, confirm the plausibility of Wells Fargo's actual knowledge of the fraud on consumers as alleged. *See, e.g.*, *id.* ¶¶ 1, 5, 6, 8, 10, 13, 68, 70, 74, 77, 135, 137-40, 143, 146, 177-78; *see also* Part III.A.2.c, *infra* (discussing Wells Fargo's knowing provision of atypical banking services and providing additional evidence of actual knowledge).

### b. California case law establishes that the Receiver's allegations are sufficient at this stage.

Numerous courts have denied motions to dismiss aiding and abetting fraud claims upon consideration of allegations, similar to those here, in support of defendants' "actual knowledge" of the primary wrongs. In *Benson*, for example, the court held that actual knowledge was sufficiently pled where the plaintiff

alleged that the faces of investor checks demonstrated fraud, investor funds were commingled and wired to offshore bank accounts, and senior bank employees oversaw transactions. 2010 WL 1526394, at *3-4; *compare, e.g.*, Compl. ¶¶ 6, 13, 108, 157, 182, 198, 207-31, *with Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200, 1208 (C.D. Cal. 2006) (allegations "that Defendant knew the hallmark characteristics of a Ponzi scheme, and identified these characteristics in the [fraudulent entities'] accounts"); *Woodbridge*, 2020 WL 4529739, at *2, *6 (allegations that defendant had a "close business relationship with [tortfeasor] ...knew that Woodbridge was co-mingling investor funds[and] continued to facilitate the []scheme despite 'numerous indicia of wrongdoing'"); *Chang*, 2020 WL 1694360, at *5 (allegations that "Wells Fargo processed all transactions and reviewed the accounts as part of its due diligence...deviated 'from the standard course of business' and made available and accepted for use a 'modified version of its Direct Deposit Authorization Form'" sufficient); *Umpqua*, ECF No. 33 at 3 (allegations that all accounts involved in Ponzi scheme belonged to defendant bank, defendant monitored these accounts as part of its "customer due diligence obligations," and learned tortfeasor "was operating a Ponzi scheme" sufficient).

Even the cases that Wells Fargo cites undermine its claim that the Receiver has failed to allege its actual knowledge of the fraud. For instance, Wells Fargo cites *Lorenz v. E.W. Bancorp*, 2016 WL 199392 (C.D. Cal. Jan. 14, 2016) and *Neilson* for the unremarkable proposition that constructive knowledge is insufficient for actual knowledge. *See* Mot. at 9-10. But Wells Fargo nowhere mentions that the courts in both cases *denied* motions to dismiss, finding that there were sufficient allegations to support the defendant banks' actual knowledge. In *Neilson*, the court allowed an amended complaint to stand after the plaintiffs changed the allegations to allege specifically that the defendant bank "knew," instead of that it "knew or should have known." *See id.*, 290 F. Supp. 2d at 1120 (actual knowledge alleged where "[t]he complaint detail[ed] the manner in which

the Ponzi scheme operated, describe[d] [the tortfeasor]'s fraudulent transactions, and outline[d] the Banks' involvement in these activities," including that "the Banks utilized atypical banking procedures to service [the tortfeasor]'s accounts, raising an inference that they knew of the Ponzi scheme and sought to accommodate it by altering their normal ways of doing business"); *compare with, e.g.*, Compl. ¶¶ 207-25. And in *Lorenz*, the court found the plaintiffs had alleged actual knowledge when they pled that the defendant bank "determine[d] [the investment company] was a fraudulent scheme, but did not cease doing business with it." 2016 WL 199392, at *8. Likewise, the Receiver has alleged that Wells Fargo had actual knowledge of the fraudulent schemes—not merely that it *should have known*, and Wells did not cease doing business with the schemes but instead expanded the relationships. *See, e.g.*, Compl. ¶¶ 104, 107, 123, 185.

Contrary to Wells Fargo's briefing, neither *Casey* nor *Paskenta Band of Nomlaki Indians v. Crosby* ("*Paskenta*"), 2016 WL 6094468, at *3 (E.D. Cal. Oct. 19, 2016), *aff'd sub nom.*, 854 F. App'x 872 (9th Cir. 2021) supports the dismissal of the Receiver's claims. In *Casey*, the trustee plaintiff made a number of allegations regarding the defendant banks' knowledge of the primary tortfeasors' wrongdoing but failed to link those allegations to the underlying wrong itself. The trustee's best effort was to allege that "'each [bank] acted with knowledge of the primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct.'" *Casey*, 127 Cal. App. 4th at 1153. The "primary wrongdoing" was left unspecified, and as a result, the trustee failed to plead the claim. *See id.* As the court in *Casey* noted when granting the trustee leave to amend, however, "if the Trustee can allege the banks knew the [principals] were stealing corporate funds and knowingly assisted the [principals] in laundering th[e] stolen money, those allegations would suffice to state a claim for aiding and abetting the theft (or breach of fiduciary duty)." *Id.* at 1151. Here, the Receiver has alleged significantly more than what the *Casey* court would have required the

trustee to allege to sustain his claim, including that Wells Fargo knew about the underlying fraud on consumers for numerous reasons, including high chargeback rates (*see* Compl. ¶¶ 78-81, 84-87, 178-86), the Enterprises' principals' closure of accounts that lost access to merchant processing services (*see id.* ¶¶ 70, 75, 84, 86, 138, 143), Wells Fargo's own consumer customers' disputation of the Enterprises' charges to their credit cards (*see id.* ¶¶ 101, 129), and Wells Fargo's own exposure to the underlying business through Apex's application for merchant processing (*see id.* ¶¶ 110-27) and Triangle's for ACH (*see id.* ¶¶ 170-77) (both of which were ultimately denied by Wells Fargo). Unlike in *Casey*, the link between the Receiver's knowledge allegations and the underlying fraud is clear.

In *Paskenta*, the Native American plaintiffs alleged that the bank defendants had actual knowledge of the wrongdoers' conversion of funds held in tribal accounts. Their only support for that allegation, however, was that authorized signers on the accounts made large withdrawals amid negative media coverage. *See* 2016 WL 6094468, at *3-*7. The Receiver's allegations, as discussed immediately above and elsewhere in this opposition, are more numerous, more detailed, and more closely tethered to the underlying fraud. And, contrary to Wells Fargo's contention (Mot. at 6 n.4), the court in *Paskenta* used the very same legal standard for determining actual knowledge as the courts in *Chang* and *Woodbridge* did; the facts were just different. Neither *Casey* nor *Paskenta* supports dismissal.

### c.   The Receiver has alleged that Wells Fargo provided substantial assistance to Apex and Triangle.

Wells Fargo does not contest the Receiver's allegation that the assistance it provided to the Apex and Triangle frauds was substantial. Instead, it attempts to argue that the Receiver has only alleged that Wells Fargo engaged in "ordinary business transactions" (not true) and that, as such, Wells Fargo would need to have had actual knowledge of the fraud before its assistance could "count" for purposes of the aiding and abetting tort. *See* Mot. at 10-11. In so doing, it hinges its entire argument on the question of actual knowledge, which, for the reasons discussed

above, the Receiver has sufficiently alleged.

Wells Fargo also fails to acknowledge that the Receiver has alleged that Wells Fargo did more than engage in "ordinary business transactions." Specifically, the Receiver has alleged that Wells Fargo "utilized atypical banking procedures to service [the Apex and Triangle accounts]," which at a bare minimum "rais[es] an inference that they knew of the [fraud] and sought to accommodate it by altering their normal ways of doing business." *Neilson*, 290 F. Supp. 2d at 1120. Such services included scrubbing bank reference letters of ownership information at the owner's request (Compl. ¶¶ 88-95), advising Apex on how to "fix" obvious inconsistencies in beneficial ownership information to get new accounts approved (*id.* ¶ 113), deleting material evidence of Apex's fraud (which Wells Fargo was legally required to keep) at an Apex employee's request (*id.* ¶¶ 132-134), removing certain approval requirements so Triangle's Phillips could generate and send wires for accounts for which he was not the nominal owner (*id.* ¶ 155), allowing Phillips to provide documentation for the opening of a bank account for a company held in a nominee's name (*id.* ¶ 158), taking Triangle's Phillips off an account and replacing him with a nominee, but allowing Phillips to retain control (*id.* ¶ 161), advising Phillips on a "work around" so he could have access to accounts he did not own (*id.* ¶¶ 164-67), and ignoring AML regulations (*see id.* ¶¶ 167-69).

As the Receiver has alleged, Wells Fargo knew that the actions it was taking would inevitably assist in the Apex and Triangle frauds. This was true for both its provision of ordinary banking transactions (such as opening streams of depository accounts vital to the fraud, *see, e.g.*, Compl. ¶¶ 49-68) and also through its provision of atypical banking services as discussed above. In each case, the benefit to Apex and Triangle was obvious: access to the anonymized shell accounts necessary to perpetrate their internet scams. Wells Fargo's motivation to assist in the fraud is equally apparent: the Apex and Triangle Enterprises provided Wells Fargo with a never-ending supply of new accounts, which was of huge benefit to

bankers trying to stay afloat in Wells Fargo's toxic sales culture.

The substantial nature of the assistance that Wells Fargo provided to the Apex and Triangle Enterprises is alleged throughout the complaint. The reality was that "[h]aving the Wells Fargo bank accounts *was a prerequisite* for the Enterprises to secure accounts with merchant processors, which the Enterprises needed to accept consumers' credit and debit card payments." *See* Compl. ¶ 3 (emphasis added); *see also id.* ¶¶ 52-68. In addition to opening the necessary accounts, Wells Fargo assisted the Enterprises in concealing the accounts' true ownership information which, if disclosed, would have been the death knell for the frauds as merchant processors would have refused to deal with the Enterprises (*see id.* ¶¶ 49-68); Wells Fargo bankers also deleted material evidence of the fraud (*see id.* ¶¶ 132-134) and helped the Enterprises' principals gain access to funds in accounts for which they were not the nominal owners (*see id.* ¶¶ 155-58). Wells Fargo's assistance was not just substantial but *critical* to the frauds' success.

### d. The Receiver does not seek to impose an unrecognized duty on Wells Fargo to monitor its customers' accounts.

At numerous times in its brief, Wells Fargo claims that the Receiver is seeking to impose "an unrecognized duty on Wells Fargo to affirmatively monitor its customer's business deposit accounts." *See* Mot. at 1, 8. Just as Bank of America did in *Simi I*, 2012 WL 1997232 (cited and discussed *supra*), Wells Fargo "misses the point" when it argues that it "cannot be held liable for legal duties it does not have." *See id.* at *6. Even though "California law does limit the duties of a bank toward its depositors…a bank's actions, even if they do not independently give rise to liability, may serve as indicia of actual knowledge that buttress an aiding and abetting claim." *Id.*; *see also, e.g., Simi Mgmt. Corp. v. Bank of Am., N.A.* ("*Simi II*"), 930 F. Supp. 2d 1082, 1100 (N.D. Cal. 2013) ("[The tortfeasor]'s prolific fraudulent transactions could support a reasonable jury finding of BofA's actual knowledge of [the tortfeasor]'s embezzlement, conversion and breach of fiduciary duty."). Wells Fargo's attempt to portray the Complaint as imposing a

duty to monitor is a red herring, as any such "duty" becomes superfluous where, as here, the Receiver has alleged *actual* knowledge. *See, e.g.*, *Evans v. ZB, N.A.*, 779 Fed. App'x 443, 445 (9th Cir. 2019) (relevant issue for determining actual knowledge is what bank actually did, not what duty it had).

### e.     *Wells Fargo's imputation defense is unavailing.*

Buried in the footnotes to Wells Fargo's motion is the admission that the Receiver has alleged that "Wells Fargo bankers colluded with the Bad Actors in violation of bank policy." *See* Mot. at 9 n.6. Unable to deny the allegations, Wells Fargo pivots to arguing that the knowledge of Wells Fargo's "rogue" employees cannot be imputed to Wells Fargo itself. *See id.* ("To the extent any rogue bankers had knowledge of the underlying fraud, such knowledge may not be imputed to Wells Fargo."). By relegating this imputation argument to a footnote, Wells Fargo has effectively waived it. *See Est. of Saunders v. C.I.R.*, 745 F.3d 953, 962 (9th Cir. 2014); *Cheever v. Huawei Device USA*, 2019 WL 8883942, at * 3 (N.D. Cal. Dec. 4, 2019) ("Because Defendants relegate the argument to a footnote… the Court will decline to consider it.").

Even if the Court were to consider this fact-intensive argument at this early stage, however, it is wrong as a matter of law. The general rule is that "[t]he law imputes the knowledge to the principal, regardless of whether the agent actually communicates the knowledge to the principal," and the principal "is bound by the fraudulent or negligent acts of its agents acting within the scope of employment." *River Colony Ests. Gen. P'ship v. Bayview Fin. Trading Grp., Inc.*, 287 F. Supp. 2d 1213, 1227 (S.D. Cal. 2003). The Wells Fargo bankers in the Complaint were providing banking services that were certainly "within the scope of [their] employment." *River Colony*, 287 F. Supp. 2d at 1227. Wells Fargo cannot argue otherwise, especially since it created and sanctioned the policies that its employees were following and which led to the misconduct here. *See, e.g.*, Compl. ¶¶ 39-48.

### f.     *Wells Fargo's toxic sales culture is directly relevant.*

Despite Wells Fargo's efforts to minimize the broader impact of its toxic sales culture and prior sales practices, both are directly relevant to the Receiver's allegations and confirm their plausibility. As alleged by the Receiver—and as confirmed by a number of public admissions made by Wells Fargo, including its express admissions in a criminal Deferred Prosecution Agreement, *see* Compl. ¶ 46—Wells Fargo was not just any other bank: it was unique among its banking peers in driving its Community Bank employees to open a staggering number of new accounts, which inevitably drove those employees to open bank accounts at any cost. *See id.* ¶¶ 39-48.

Despite the obvious relevance that Wells Fargo's criminal *account opening* misconduct has to the current allegations, Wells Fargo, again by way of a footnote, asks the Court to "disregard these superfluous allegations." Mot. at 10 n.7. But the same sales culture incentivized Wells Fargo bankers here to assist the Apex and Triangle schemes by, among other things, approving and opening roughly *one hundred and fifty* accounts for Apex and Triangle shell companies engaged in large-scale internet scams and credit card laundering. *See, e.g.*, *id.* ¶¶ 48, 51, 82-83, 94, 105, 123-25, 147, 158, 186. Wells Fargo tries to distinguish between its criminal misdeeds (opening bank accounts "not requested by [its] customers" in their names) and the misconduct alleged here (opening bank accounts for use in a fraud, when Wells Fargo should have refused to), *see* Mot. at 10 n.7, but this is a false distinction. Both harms have the same root cause and are a direct and foreseeable consequence of Wells Fargo's volume-based sales culture, which pressured Community Bank employees to open as many accounts as possible under threat of termination.

3.     The Receiver Alleges Aiding and Abetting Breach of Fiduciary Duty

Wells Fargo's argument for dismissing the aiding and abetting breach of fiduciary duty claim is equally unpersuasive. The Receiver has alleged all the elements of the claim: both that the Apex and Triangle Enterprises' principals

(Phillips, Peikos, and Barnett) owed fiduciary duties to the respective Receivership Entities based on their complete control and ownership of the entities (*see* Compl. ¶ 252; *see also, e.g.*, *id.* ¶¶ 70-71, 108-22, 132, 138-40, 143-48, 157-59, 161-69) and that Wells Fargo had actual knowledge that the three breached their fiduciary duties to the Receivership Entities and assisted them nonetheless (*id.* ¶ 255).

Notwithstanding this, Wells Fargo argues that more detailed pleading is required to establish Wells Fargo's knowledge of the fiduciary duties owed by the Triangle and Apex principals, including "*when*" Wells Fargo knew and "*how*" it knew that the principals were fiduciaries. Mot. at 12 (emphasis in original). But under Rule 9(b), as discussed above, knowledge may be averred generally; the only question is whether that knowledge is plausibly alleged. There is no requirement that the Receiver notate the date and time at which each individual Wells Fargo employee concluded that a fiduciary duty existed. The cases state just the opposite. For example, in *Chang* (where Wells Fargo was a party), the Court expressly found similar allegations regarding breach of fiduciary duty claims sufficient, holding that "it is unnecessary for Plaintiff to allege who at [the bank] knew that [the chief perpetrator] owed depositors a fiduciary duty, or when or how they acquired such knowledge." *Chang*, 2020 WL 1694360 at *7.

As discussed *supra*, the Receiver has alleged that Wells Fargo knew that the Apex and Triangle principals were the true owners and controllers of all of the Wells Fargo accounts and treated them as such, taking directions from the principals and not the "nominee" owners. *See, e.g.*, Compl. ¶¶ 132 (alleging banker received (and deleted, at Apex's request) a spreadsheet listing all active shell entities engaged in credit card laundering under the control of Apex's Peikos), ¶ 164 (alleging a request from Triangle's Phillips to banker Cording to add another shell account to his "consolidated Business banking view in the [Wells Fargo] portal"). Accordingly, Wells Fargo knew that the principals of Apex and Triangle owed a fiduciary duty to their respective enterprises and breached that duty. *See,*

*e.g.*, *Simi II,* 930 F.Supp.2d at 1100 ("[T]he fact that BofA knew that [the tortfeasor] was Plaintiff's CFO, could also add to a reasonable inference of actual knowledge of [the tortfeasor's] breach of fiduciary duty to Plaintiff.").

The Receiver has alleged multiple ways in which the principals breached their fiduciary duties and the means by which Wells Fargo learned of those breaches. Wells Fargo knew that the principals were misusing and abusing the accounts' beneficial ownership information. *See, e.g.*, Compl. ¶¶ 88-95, 113, 132-34, 155, 158, 161, 164-69. Wells Fargo likewise knew that the Enterprises' principals were funneling money out of the shell accounts and over to accounts held by the principals, all of which occurred with Wells Fargo's full knowledge and without any business justification. *See, e.g.*, *id.* ¶¶ 72-74, 104, 148, 187-206; *see also Chang*, 2020 WL 1694360, at *7 (alleging Wells Fargo's knowledge of tortfeasor's breach of fiduciary duty to plaintiff when tortfeasor improperly transferred monies from shell accounts to tortfeasor's accounts). Despite being aware of the principals' breaches of their fiduciary duties, Wells Fargo provided them with substantial assistance for their breaches, including both the execution of ordinary business transactions and the provision of atypical banking services. *See supra* at Part III.A.2.c. The Receiver has plausibly alleged each element of his aiding and abetting breach of fiduciary duty claim, and it survives.

4.   The Receiver Alleges Aiding and Abetting Conversion

Wells Fargo repeats the same unpersuasive arguments as to the aiding and abetting conversion claim, ignoring the Receiver's plausible allegations of its knowledge. *See* Mot. at 12. Just like Wells Fargo knew that the Enterprises' principals were breaching their fiduciary duties by, among other things, committing fraud and making fraudulent transfers for their own benefit, Wells Fargo likewise knew that these same principals were wrongfully exercising dominion over property belonging to the Receivership Entities. *Compare, e.g.*, Compl. ¶¶ 257-61, *with Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015) (identifying

1    elements of conversion claim). The claim survives.

2        5.    The Receiver Alleges Aiding and Abetting Fraudulent Transfers

3        Wells Fargo claims that "there is no cognizable cause of action for aiding

4    abetting a fraudulent transfer under California law." Mot. at 13. That would be

5    troubling for the Receiver's claim—if it were true. But California's Second District

6    Court of Appeal (the same court of appeal cited by Wells Fargo) held last year

7    without equivocation that **"California law *recognizes* liability for aiding and

8    abetting a fraudulent transfer."** *Aghaian v. Minassian*, 59 Cal. App. 5th 447, 459

9    (2020) (emphasis added) (citing *Berger v. Varum*, 35 Cal. App. 5th 1013, 1025

10   (2019)). The cases cited by Wells Fargo that it claims suggest otherwise (*see* Mot.

11   at 13) are unpublished and predate a published opinion (*Aghaian*) from the same

12   court that confirmed the tort's existence in California.

13       Wells Fargo's only other argument for dismissing the aiding and abetting

14   fraudulent transfer claim is that the Receiver has failed to allege Wells Fargo's

15   actual knowledge of the fraudulent transfers. Again, the Receiver has alleged Wells

16   Fargo's actual knowledge of the fraudulent transfers directly (*see, e.g.*, Compl.

17   ¶¶ 249, 285, 287) and supported it with a host of well-pled factual allegations that

18   make Wells Fargo's knowledge of the fraudulent transfers plausible. *See, e.g.*, *id.*

19   ¶¶ 81, 85, 104 (millions of dollars flowing into and out of accounts with projected

20   sales of $100), ¶¶ 6, 13, 66-67, 71, 146-48 (true owners of accounts did not match

21   nominal owners, but Wells Fargo accommodated true owners' atypical banking

22   requests), ¶¶ 182, 219 (Wells Fargo processed suspicious large-figure, round-

23   number transfers), ¶¶ 198, 284 (Wells Fargo transferred funds from Receivership

24   Entities' accounts to principals' personal and offshore accounts). Because the

25   Receiver has sufficiently alleged all elements of the claim (including a number,

26   such as the underlying transfers, which Wells Fargo does not challenge), the

27   Receiver's aiding and abetting fraudulent transfer claim survives.

28   **B.    The Receiver Alleges Conspiracy to Commit Fraud**

Wells Fargo again engages in selective citation to try and make a colorable argument that the Receiver's conspiracy to commit fraud claim should be dismissed when it plainly should not be. Wells Fargo relies on a partial quotation from *Choate v. County of Orange*, 86 Cal. App. 4th 312, 333 (2000) to claim that the Receiver has a "weighty burden" to allege a conspiracy. But that portion of the *Choate* opinion referred to proof, not allegations. *Choate* actually said that "[b]ecause civil conspiracy *is so easy to allege*, plaintiffs have a weighty burden to prove it." *Id*. (emphasis added). Wells Fargo then pivots and cites *Kidron v. Movie Acquisition Corp.*, 40 Cal App. 4th 1571, 1582 (1995) for the proposition that the co-conspirators must have "agreed to a common plan," as if the Complaint does not allege exactly that. *See* Compl. ¶ 244.

In a footnote, Wells Fargo even admits that "Plaintiffs allege certain Wells Fargo bankers *colluded* with the Bad Actors in violation of bank policy." *See* Mot. at 9 n.6 (emphasis added). Merriam-Webster defines "collude" as follows: "[T]o work together secretly especially in order to do something illegal or dishonest: **CONSPIRE**, PLOT." https://www.merriam-webster.com/dictionary/collude (emphasis added). Further, "[a]n agreement may be tacit as well as express. A conspirator's concurrence in the scheme may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1292 (2015); *see also, e.g.*, *Aifang v. Velocity VIII L.P.*, 2016 WL 5420641, at *5 (C.D. Cal. Sept. 26, 2016) (judgment entered on conspiracy claim given "the inference of an agreement to commit fraud among [defendants]").

The Receiver's factual allegations support the logical "inference of an agreement to commit fraud": Wells Fargo advised principals on how to set up bank accounts with straw owners (Compl. ¶ 13); Wells Fargo opened said accounts (*id.* ¶ 71); Wells Fargo helped the principals hide the accounts' true owners (*id.* ¶ 68); Wells Fargo ignored its AML training in favor of assisting the frauds (*id.* ¶ 79);

Wells Fargo rewrote and reissued bank reference letters at Apex's Barnett's request to specifically, and atypically, omit his name (*id*. ¶¶ 88-89, 95); Wells Fargo assisted Apex in hiding beneficial ownership discrepancies that were indicia of fraud (*id*. ¶¶ 111-23); Wells Fargo gave Triangle's Phillips control of accounts that were nominally 100% owned by others (*id*. ¶¶ 146-48,158); Wells Fargo changed account information to hide Phillips' name (*id*. ¶ 161); Wells Fargo warned Phillips that the straw owners listed on accounts he was opening would have the power to actually control the accounts (*id*. ¶ 163); and Wells Fargo helped Phillips provide inaccurate records for FinCEN compliance (*id*. ¶¶ 168-69). Taken together, these allegations and others in the Complaint more than support an "inference" of a conspiracy (*i.e.*, collusion) among Wells Fargo and the fraudsters.

**C.     The Receiver Alleges Two Alternative Negligence Claims**

      1.     <u>The Receiver Alleges Negligence in the Alternative</u>

      The only element of the Receiver's negligence claim which Wells Fargo appears to challenge is that of duty. It argues that "Plaintiff is unable to allege the requisite existence of a duty of care," apparently because the Receiver "premises his negligence claims on the contention that Wells Fargo owed a duty [to monitor] irregular activities," which Wells Fargo claims "simply does not exist." Mot. at 16.

      But that is not what the Receiver "premises his negligence claims on." What the Receiver *actually* alleges is that Wells Fargo violated the "well established" duty it has "to act with reasonable care in its transactions with its depositors." *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 543 (1998). The Complaint specifically alleges that "because the Receivership Entities were customers of Wells Fargo, ***the Bank owed them a duty to act with reasonable care in its dealings with, and in performing its services for, the Receivership Entities and their accounts***." Compl. ¶¶ 308-309 (emphasis added); *see also, e.g.*, ¶ 247. The Receiver alleges multiple ways in which Wells Fargo breached that duty, including, among other things, by "establish[ing] corporate policies that prioritized

1   the opening of accounts above anything else – a policy which uniquely

2   incentivized its employees to facilitate the banking activities of shell companies,

3   which any banker would know were key indicia of fraud and money laundering"

4   and by "failing to prevent fraud, including the transfer of Receivership Entities'

5   assets to [the principals] and third parties." *Id.* ¶ 309.

6        Wells Fargo's citations to case law in opposition are, once again,

7   misleading. Wells Fargo cites *Chazen* as dismissing a negligence claim based on

8   the plaintiff's allegation "that the bank had 'actual or constructive notice of the

9   [bad actor's] conversion of [their] funds based upon irregular activities.'" Mot. at

10  16 (citing *Chazen*, 61 Cal. App. 4th at 537, 540). That was not the holding of

11  *Chazen*, however, and the quote comes from the section of the opinion addressing

12  the plaintiffs' conversion claim. It was *not* the reason for the dismissal of the

13  negligence claim; rather, the *Chazen* court dismissed the negligence claim because

14  the plaintiffs "failed to state facts giving rise to a duty of care to ***nondepositors***."

15  *Id.* at 545 (emphasis added). The plaintiffs alleged the bank breached a duty of care

16  when it improperly disbursed funds from a trust account upon oral requests, at the

17  request of unauthorized persons, and at the request of non-signatories. *See id.* at

18  543. The *Chazen* court dismissed the negligence claim because the plaintiffs were

19  nondepositors and had failed to allege the bank owed them a duty. In doing so,

20  however, the court acknowledged that taking the allegations as true, they *would*

21  "state a breach of the bank's duty of care under the deposit agreement"—*i.e.*, with

22  respect to depositors like the Receivership Entities here. *See id.* at 543. Applying

23  the logic of *Chazen*, the Receiver's negligence claim (which is supported by

24  allegations substantially more egregious than those in *Chazen*) survives.

25       *Chazen* fully aligns with California courts' assessment of banks' compliance

26  with "the custom[] and practice in the banking industry" as a means to determine

27  whether the banks used reasonable care when handling accounts. *See Bullis v. Sec.*

28  *Pac. Nat'l Bank*, 21 Cal. 3d 801, 809 (1978) (considering such evidence). The

Receiver has alleged many times over the ways in which Wells Fargo's actions were well outside industry standards. *See, e.g.*, Compl. ¶¶ 47-48 (alleging Wells Fargo's sales culture and lax oversight of branches was unique among its banking peers); *see also* ¶ 150 ("Dude, you still don't understand how wells is totally different."), ¶ 168 (alleging Wells Fargo failed to implement banking rules "accepted as standard practices"), ¶¶ 185-86 (alleging Wells Fargo "flouted the common industry role…of the Relationship Manager position"), ¶¶ 207-25 (alleging Wells Fargo's violation of banking rules and regulations). The Receiver has also alleged that Wells Fargo violated its own internal policies and procedures as they were written (*see, e.g.*, *id.* ¶¶ 74, 87, 177), which the California Supreme Court in *Bullis*, 21 Cal. 3d at 809, found was evidence of the bank's failure to act with the requisite care. These allegations show that Wells Fargo did not act with the requisite care towards its depositors, the Receivership Entities. Among other things, its failure to do so allowed the Enterprises' principals to siphon off funds belonging to the Receivership Entities for their own, personal use and to the entities' detriment. *See* Compl. ¶¶ 305-10. The Receiver's alternative negligence claim, brought on behalf of the depositor Receivership Entities, should survive.

2. <u>The Receiver Alleges Negligent Supervision in the Alternative</u>

Wells Fargo's primary argument for dismissing the Receiver's negligent supervision claim appears to be that the Receiver "does not allege Wells Fargo actually knew" its employees could not be trusted or posed a particular risk. Mot. at 16. Because the claim is one of negligence, the question is actually whether Wells Fargo "knew *or should have known*" about the risk. *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 815 (2006) (emphasis added). (The Receiver has alleged both.) In parallel to its mischaracterization of the standard, Wells Fargo tries to shoehorn the Receiver's claim into its most common iteration, that of negligent hiring as opposed to supervision, but the tort is not so narrowly defined.

California courts "follow[] the rule set forth in the Restatement Second of

Agency § 213," the counterpart to which is § 7.05 in the Restatement Third of Agency. *Phillips v. TLC Plumbing, Inc.,* 172 Cal. App. 4th 1133, 1139-40 (2009). The comments to § 7.05 emphasize that negligent supervision claims focus on whether or not there is "a foreseeable likelihood that harm will result from the conduct," and acknowledge that "[a] principal's duty of care also encompasses reasonable mechanisms to assure compliance with instructions." Rest. 3d. Agency, § 7.05, com. d; *see also* Rest. 2d Agency, § 213(a). This is *exactly* the situation here. Numerous government agencies have found (and Wells Fargo itself has admitted) that Wells Fargo's sales practices drove its employees to open unauthorized accounts and credit lines. *See, e.g.*, Compl. ¶¶ 39-48.

The Office of the Comptroller of the Currency ("OCC") recognized that this widespread misconduct could not have occurred without Wells Fargo's approval, finding that Wells Fargo knowingly "tolerated pervasive sales practices misconduct as an acceptable side effect of the Community Bank's profitable sales model" and largely declined to implement "effective controls to catch systemic misconduct." *Id.* ¶ 45. What controls it *did* implement, the OCC found, were "***intentionally designed and maintained…to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank***." *Id.* (emphasis added); *see also id.* ¶ 46 (fraud continued *even though* Wells Fargo had been alerted to the fraud by its own compliance employees, managers, and branch-level employees), ¶¶ 226-31 (discussing Wells Fargo executives' and higher-level employees' ratification of branch-level actions).

The Receiver has alleged that Wells Fargo intentionally built a "compliance" system that would maximize the Community Bank's moneymaking potential regardless of the consequences. In so doing, it effectively made a conscious decision to negligently supervise each and every one of its Community Bank branch employees—including the employees at issue here. Put another way, Wells Fargo cannot argue that it had no prior knowledge of its employees' unfitness

because, as alleged, it *established Bank-level policies that would virtually guarantee that its Community Bank employees would act unfittingly*, such that there was "a foreseeable likelihood that harm w[ould] result from the conduct." *See* Rest. 3d Agency § 7.05, com. d*; compare* Compl. ¶¶ 39-48 *with, e.g., Bullis*, 21 Cal. 3d 801 (endorsing negligent supervision theory based on faulty account opening procedures); *see also D.Z. v. Los Angeles Unified School Dist.*, 35 Cal. App. 5th 210, 229 (2019) (negligent supervision claim "established if a reasonably prudent person would foresee that injuries of the same general type would be likely to happen in the absence of [adequate] safeguards"); Rest. Agency, § 7.05, com. d (example of bank liability for employees' misconduct where bank failed to provide training and its "internal compliance mechanisms" failed to "detect the irregularities accompanying the opening of [a bank] account"). The Receiver's alternative negligent supervision claim survives.

**D.    The Receiver Alleges a Claim Under California Penal Code § 496**

Wells Fargo seeks dismissal of the Receiver's Section 496 claim on three grounds: (1) the funds misappropriated from consumers do not qualify as "stolen property," (2) "there are no allegations that Wells Fargo concealed or withheld funds from consumers," and (3) the Receiver has not established that Wells Fargo "*actually knew*" the funds were stolen. Mot. at 17. None is availing.

First, as Wells Fargo acknowledges, *Bell v. Feibush*, 212 Cal. App. 4th 1041, 1048 (2013) confirmed that theft by false pretenses can serve as the basis for a Section 496(c) claim with treble damages. *Siry Investment, L.P. v. Farkhondehpour*, 45 Cal. App. 5th 1098 (2020), *review granted*, 468 P.3d 701 (July 8, 2020) reached a different conclusion, but as Wells Fargo acknowledges (again in a footnote), until California's Supreme Court issues an opinion, *Siry* "*has no binding or precedential effect*." Cal. R. Ct. 8.1115(e)(1) (emphasis added). As of now, *Bell* remains good law. This is for good reason: Section 496 applies to "property that has…been obtained in any manner constituting theft," and the Penal

Code defines theft to include "any false or fraudulent representation or pretense, [that] defraud[s] any other person of money." Cal. Pen. Code § 484(a) (quoted in *Bell*, 212 Cal. App. 4th at 1048). Because the Receiver has alleged that consumers were defrauded by both Enterprises (*see, e.g.*, Compl. ¶ 2), the funds misappropriated by the Enterprises constitute "stolen property."

Second, regarding Wells Fargo's argument that "there are no allegations that Wells Fargo concealed or withheld funds from consumers" (Mot. at 17), Wells Fargo ignores that Section 496(a)'s express language is "***received***, concealed, ***or*** withheld." *Id.* (emphasis added); *see Switzer v. Wood*, 35 Cal. App. 5th 116, 126 (2019). The Receiver is only required to allege "(1) the property was stolen; (2) the defendant knew the property was stolen; and, (3) the defendant had possession of the stolen property." *Lacagnina v. Comprehend Sys., Inc.*, 25 Cal. App. 5th 955, 970 (2018). The Receiver has alleged all three. *See* Compl. ¶¶ 265-67.

Finally, Wells Fargo again argues that the Receiver has failed to allege that it knew the consumer funds were stolen. The Receiver has alleged that Wells Fargo had such knowledge, however. *See* Compl. ¶ 2. That allegation is supported by a host of other allegations that render it more than plausible. *See, e.g.*, *id.* ¶¶ 55-56, 61-68, 70, 84-86, 98-102, 179, 220 (Wells Fargo's knowledge of the shell companies' high chargeback rates, including via its own customers' dispute of charges to their Wells Fargo accounts), ¶¶ 84-87 (Wells Fargo closing accounts with high chargeback rates and opening others with same patterns of activity), ¶¶ 87, 92, 97, 128-131, 147, 171, 220-25 (Wells Fargo recognizing that Apex and Triangle were "high risk" for fraud). The Receiver's Section 496 claim survives.

## E.    The Receiver Alleges an Unfair Competition Law (UCL) Claim

Wells Fargo's challenges to the Receiver's UCL claim likewise fail. Its first contention, that the Receiver has failed to allege an underlying tort, is incorrect because the Receiver *has* sufficiently alleged the underlying torts of aiding and abetting fraud, conspiracy to commit fraud, and a violation of Penal Code § 496 for

the reasons discussed above. Wells Fargo then cites *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (2020) for the proposition that a UCL plaintiff "must establish that she lacks an adequate remedy at law." The Receiver acknowledges there is a split among the lower courts regarding whether *Sonner* (which involved a case two months before trial) applies to cases at the pleading stage, where alternative remedies can be pled. Wells Fargo takes the position that it does, but a number of courts have taken the opposite position. *See, e.g.*, *Krause-Pettai v. Unilver United States, Inc.*, 2021 WL 1597931, at *4 (S.D. Cal. April 23, 2021); *see also Rothman v. Equinox Holdings, Inc.*, 2021 WL 1627490, at *12 (C.D. Cal. Apr. 27, 2021) (collecting cases). The Receiver respectfully submits that the latter cases are correct, and the Receiver's UCL claim survives.

Wells Fargo also challenges the Receiver's standing to assert a UCL claim, which it suggests is premised on the "contractually authorized fees" paid by the Receivership Entities to Wells Fargo. *See* Mot. at 20. But the Receiver is *not* alleging that the fees Wells Fargo charged were unconscionable, as was the case in *California Grocers Assn. v. Bank of America*, 22 Cal. App. 4th 205, 218 (1994) (cited by Mot. at 20), or that the Receivership Entities were somehow deceived by the fees, as was the case in *Walker v. Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1178 (2002) (cited by Mot. at 20-21). In fact, the allegations within the UCL count nowhere mention fees. *See* Compl. ¶¶ 269-73. The Complaint alleges that the Receivership Entities lost funds in a number of ways, including by the payment of fees to open accounts *for the fraud* but also encompassing, *e.g.*, the funds wrongfully transferred out of the Receivership Entities' accounts by the Apex and Triangle principals and the liability to which the Receivership Entities were ultimately subjected as a result of the fraud. *See, e.g.*, Compl. ¶ 15. Those funds were lost because of Wells Fargo's misconduct, which caused the Receivership Entities an injury in fact. The facts here are wholly distinguishable from the cases cited by Wells Fargo.

Wells Fargo's final argument, that the Receiver's claims are extraterritorial, should similarly not be credited. Though a fraction of the underlying misconduct occurred outside California, (1) the Receiver's claims are brought against Wells Fargo & Co., which is a California company; (2) Wells Fargo's executives are alleged to have directed the conduct motivating Wells Fargo's conspiracy with the Apex and Triangle Enterprises, which were both California-based; and (3) the claims involve the conduct of Wells Fargo bankers overwhelmingly located in California branches. This is more than sufficient for the Receiver's UCL claim to survive at the pleading stage. *See, e.g.*, *TRC & Assocs. v. NuScience Corp.*, 2013 WL 6073004, at *5 (C.D. Cal. Nov. 18, 2013).

**F.     The Receiver Alleges an Accounting Claim**

California permits an equitable accounting where the "accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable." *Kimball v. Flagstar Bank F.S.B.*, 881 F.Supp.2d 1209, 1224 (S.D. Cal. 2012). An accounting may also be requested where fraud is involved, as the Receiver has alleged here. *See, e.g.*, *Union Bank v. Superior Court*, 31 Cal. App. 4th 573, 593 (1995). The accounting claim survives.

**G.     The Receiver Withdraws His Direct Breach of Fiduciary Duty and Unjust Enrichment Claims**

Upon review of the authorities cited by Wells Fargo, the Receiver elects to withdraw his breach of fiduciary duty claim (Count 3). His unjust enrichment claim (Count 9) is withdrawn as a cause of action, but he retains it as a remedy.[2]

## IV.  CONCLUSION

For the foregoing reasons, the Receiver respectfully requests that the Court deny Wells Fargo's Motion to Dismiss or, if it grants the motion in whole or in part, give the Receiver leave to amend to cure any defects.

---

[2] The Receiver believes the Court need not rule on these claims as they are withdrawn, but if the Court believes a ruling is necessary, he asks that the Court grant the motion without prejudice with respect to these claims.

1

2    Dated: October 8, 2021             MCNAMARA SMITH LLP
                                         By:   /s/ Logan D. Smith

3                                          Logan D. Smith
                                         lsmith@mcnamarallp.com

4                                          Cornelia J. B. Gordon
                                         cgordon@mcnamarallp.com

5                                          655 West Broadway, Suite 900
                                         San Diego, California 92101

6                                          Telephone:  619-269-0400
                                         Facsimile:    619-269-0401

7                                          GLANCY PRONGAY & MURRAY LLP

8                                          Lionel Z. Glancy
                                         Jonathan M. Rotter

9                                          1925 Century Park East, Suite 2100
                                         Los Angeles, California 90067

10                                        Telephone:  310-201-9150
                                       Facsimile:    310-201-9160

11                                        Email: info@glancylaw.com

12                                        *Attorneys for Receiver,*
                                       *Thomas W. McNamara*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of October, 2021, the foregoing document was electronically transmitted to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.


  s/ Logan D. Smith
*Attorneys for Receiver,*
*Thomas W. McNamara*